**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSEPHINE MILLER, | : | |
|     Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:12-CV-01287 (VLB) |
| v. | : | |
| | : | |
| BRIDGEPORT BOARD OF EDUCATION | : | |
| and MARK ANASTASI, | : | |
|     Defendants. | : | July 30, 2013 |

**MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION TO DISMISS**
**[Dkt. #15]**

**I.    Introduction**

Plaintiff Josephine Miller ("Miller"), an African-American attorney licensed in Connecticut, brings this action for racial discrimination in the making and enforcement of contracts under 42 U.S.C § 1981 against Defendants Bridgeport Board of Education (the "Board") and Mark Anastasi ("Anastasi"), the City Attorney for the City of Bridgeport, in his official and individual capacities. Defendants have moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.  For the reasons that follow, Defendants' Motion to Dismiss is GRANTED.

**II.    Factual Background**

The following facts are taken from Plaintiff's complaint.  Plaintiff's action arises from her representation of Andrew Cimmino, an employee of the Board, in a civil action filed in 2006 in the United States District Court for the District of Connecticut, captioned *Lyddy, et al. v. Andrew Cimmino, et al.*, No. 3:06cv01420

1

(WWE).  [Dkt. 1, Compl. ¶ 4].  Plaintiff alleges that Cimmino, a defendant in the *Lyddy* action, was entitled to a "defense and indemnity by the Bridgeport Board of Education" pursuant to Connecticut General Statute § 7-101a.  [Dkt. 1, Compl. ¶ 5].  From the outset of the litigation in 2006 through February 2010, Plaintiff alleges that Cimmino selected and was represented by an attorney whom the Board compensated for legal services provided pursuant to Conn. Gen. Stat. § 7-101a. [Dkt. 1, Compl. ¶¶ 6-7].

On February 12, 2010, Plaintiff entered an appearance in the above litigation at Cimmino's request and on his behalf "in lieu of the appearance of Cimmino's prior attorney," and performed legal services for Cimmino until at least August 31, 2012, the date of the complaint in the present action.  [*Id.* at ¶¶ 8, 11].  Prior to her appearance on Cimmino's behalf, Plaintiff "inquired of Defendant Anastasi [the City Attorney for the city of Bridgeport] if there was any requirement she needed to fulfill in order to assume the defense of Cimmino." [*Id.* at ¶ 9].  Miller alleges that "[a]t no time did Anastasi inform Plaintiff of any reason why she was prohibited from assuming the defense of Cimmino, nor any other impediment to her providing legal services." [*Id.* at ¶ 10].  Miller does not allege that Anastasi acquiesced to her representation of Cimmino.  In addition, she does not allege that she sent a letter of representation to Anastasi delineating the scope of the engagement and the basis for calculating or the amount of fees she would charge.  Finally, she does not allege that she received a countersigned letter of representation from Anastasi.

On March 31, April 30, and May 31, 2010, Plaintiff submitted invoices to the Board for legal services performed representing Cimmino, but the Board "has failed and refused" to pay Plaintiff for the "valuable legal services performed." [*Id.* at ¶¶13-14].  Plaintiff alleges that the Defendants "have paid Caucasian attorneys for the legal services performed by them, unlike [their] refusal to pay for such services performed by Plaintiff," thereby depriving her of "the same right to make and enforce contracts as is enjoyed by white citizens."  [*Id.* at ¶¶ 15, 16].

Plaintiff has brought two counts alleging that the Defendants have racially discriminated against her in the making and enforcing of contracts in violation of 42 U.S.C. § 1981: the first against the Board and Anastasi in his official capacity, and the second against Anastasi in his individual capacity.  Currently pending before the Court is Defendants' Motion to Dismiss both counts.

III.   Standard of Review

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Sarmiento v. U.S.*, 678 F.3d 147 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to

3

relief.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint.  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  *Brass v. Am.*

*Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005) (MRK).

IV.     Discussion

Plaintiff alleges two counts of discrimination in the making and enforcement of contracts under 42 U.S.C. § 1981.  Defendants contend that Plaintiff's complaint must fail because she has failed to plead particularized facts sufficient to establish that the Defendants engaged in any discriminatory conduct or had an intent to discriminate against her on the basis of race, or that the alleged discrimination concerned the making or enforcing of a contract cognizable under § 1981.  Plaintiff counters that Connecticut General Statute § 7-101a, which provides for a municipality's indemnification of the legal costs associated with certain actions brought against its officers or employees, forms the basis of a contract between her and the municipality and on which her § 1981 action is based, and that she has sufficiently pled discrimination in the making or enforcement of that contract.

42 U.S.C. § 1981 provides in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every state and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  To successfully plead a § 1981 claim, a plaintiff must show: "(1) that she is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in § 1981."  *Broich v. Inc. Vill. of Southampton*, 462 F. App'x 39, 41-42 (2d Cir. 2012) cert. denied, 133 S. Ct. 527 (2012) (quoting *Lauture*

*v. Int'l Bus. Machines Corp.*, 216 F.3d 258, 261 (2d Cir. 2000)); *see also Morris v. Yale Univ. Sch. of Med.*, 477 F. Supp. 2d 450, 458 (D. Conn. 2007) (same).  Here, Plaintiff has established the first element of her § 1981 claim as it is not disputed that she is a member of a racial minority.  As Plaintiff concedes that her § 1981 claim rests only on her allegedly impaired ability to make and enforce contracts (*see* Dkt. 16, p. 6), the Court now examines whether Plaintiff has met the second and third elements of her claim by successfully alleging intentional racial discrimination in the making or enforcement of a contract.

   a.   <u>42 U.S.C. § 1981: Intent to Discriminate</u>

   "Essential to an action under Section 1981 are allegations that the defendants' acts were purposefully discriminatory and racially motivated."  *Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir. 1988); *see also Gen. Bldg. Contractors Ass'n, Inc. v. Penn.*, 458 U.S. 375, 391 (1982) (section 1981 can be violated only by purposeful discrimination).  "In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994); *Timmons v. City of Hartford*, 283 F. Supp. 2d 712, 717 (D. Conn. 2003) (AWT) (quoting same); *Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 332 F. Supp. 2d 592, 596 (S.D.N.Y. 2004) (same).  "[A] complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a claim under Rule 12(b)(6)."  *Yusuf*, 35 F.3d at 713 (citing *Martin v. N.Y. State Dep't of Mental*

*Hygiene*, 588 F.2d 371, 372 (2d Cir. 1978)); *Timmons*, 283 F. Supp. at 717 (same); *Evans-Gadsden*, 332 F. Supp. 2d at 596.  Further, to state a claim for individual liability under § 1981, a plaintiff must allege a specific instance of racial discrimination and also "demonstrate some affirmative link to causally connect the actor with the discriminatory action."  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000); *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) (same).  Individual liability under § 1981 must be predicated on the actor's personal involvement.  *Id*.

Here, the Plaintiff has not pled facts sufficient to allege that her race was the reason motivating Defendants' conduct.  She has alleged that Cimmino chose an attorney who Defendants paid for his services, and who Cimmino then chose to replace with the Plaintiff, who the Defendants have subsequently not paid. Although Plaintiff alleges that Anastasi did not inform her of any reason why she could not assume Cimmino's defense or any impediment to her providing him with legal services, she has failed to connect either Anastasi's alleged position or the Board's failure to pay her with any racially motivated intent.  Instead, Plaintiff simply notes that the Defendants "have paid Caucasian attorneys" for legal services performed and also paid Cimmino's former attorney (whose race does not appear in the complaint)[1] but have not paid her.  Yet Plaintiff has not alleged that Anastasi or the Board hired or retained her to perform legal services on their behalf or promised to pay her for those services such that she would be similarly

---

[1]    Although Plaintiff does not divulge this attorney's race in her complaint, she has alleged in her Reply to the Order to Show Cause that this attorney is Caucasian.  [Dkt. 14, p. 2].

situated to Cimmino's former attorney or to the other unnamed Caucasian attorneys she cites without further reference, nor has she alleged that the Board was aware of any conversation that Anastasi allegedly had with the Plaintiff. Further, nowhere in the complaint does Plaintiff allege that either Anastasi (whose race Plaintiff fails to note) or the Board were *aware* of her race such that they could make decisions based upon it.  Even had Plaintiff included the details of Cimmino's original attorney's race, the Court notes that the mere fact that this attorney was Caucasian and the Plaintiff is African American is insufficiently particularized to establish that race was a substantial factor in the Defendants' failure to pay her.  *See Rivera v. Metro. Transit Auth.*, 750 F. Supp. 2d 456, 461-62 (S.D.N.Y. 2010) ("The unstated premise of [plaintiff's] argument is that anything unwelcome that befalls any person who is an identifiable member of a minority group probably occurs because the individual is a member of that group.  While racism and all its manifestations are deplorable, the inference that it is present whenever something unwelcome happens to a member of an identifiable minority group is not rational.  There is no evidence that anything that any defendant may have done was motivated, even in part, by an intention to discriminate on the basis of race.").

In sum, Plaintiff's failure to assert any particularized facts from which the Court could conclude that the Board's failure to compensate her was due to race and not a myriad of other reasons lacks facial plausibility pursuant to the pleading standard articulated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  She thus may not prevail on the second element of her § 1981 claim.  The court's analysis

in *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994) is instructive.  In that case Yusuf, an international student, alleged that he was racially discriminated against by way of the discipline imposed upon him for allegedly sexually harassing his Caucasian roommate's girlfriend.  The Second Circuit held that a plaintiff alleging a § 1981 claim must do more than recite conclusory assertions.  Rather, a plaintiff must specifically allege events claimed to constitute intentional discrimination, which the plaintiff had failed to do.  Yusuf's Caucasian roommate physically assaulted Yusuf without provocation, for which the roommate was arrested and charged with intoxication and battery, and as a result of which the college scheduled a disciplinary hearing.  Yusuf's roommate and the roommate's girlfriend attempted to dissuade Yusuf from pressing charges with either the local authorities or with the college and, as a result, Yusuf agreed to drop all charges if his roommate would pay Yusuf's medical expenses.  The roommate refused and the plaintiff consequently refused to drop the charges.  At the disciplinary hearing, Yusuf was not questioned about the alleged assault and battery perpetrated by his roommate, but rather about his relationship with his roommate's girlfriend.  The all-white hearing panel found Yusuf's roommate to be guilty but gave him only a "suspended suspension," allowing him to remain enrolled and complete his college degree.  Thereafter, the girlfriend lodged a sexual harassment complaint with the college against the plaintiff.  At a subsequent disciplinary hearing, the panel found the plaintiff guilty of sexually harassing his roommate's girlfriend.  During the hearing, though, Yusuf was not permitted to present a key witness statement because the witness was

unavailable during the hearing date, his witness list was cut down from twelve witnesses to seven, two of his witnesses were not allowed to present testimony before the close of the hearing as time had apparently run out, and Yusuf was not permitted to present medical records tending to show that he could not have committed the alleged harassment on one of two days alleged.  He was given a suspended suspension for the current semester and a suspension for the following Fall semester.  Yusuf then brought suit claiming that race was a motivating factor behind both the guilty verdict returned against him and the disparity in the sentences rendered against him and against his roommate.

The Second Circuit affirmed dismissal of Yusuf's § 1981 claim under 12(b)(6) where the plaintiff "offered no reason to suspect that his being found guilty of sexual harassment had anything to do with his race, other than his assertion that the panel members were white and that he is Bengali."  *Id*. at 714. The Court held that

> [a] plaintiff alleging racial or gender discrimination by a university must do more than recite conclusory assertions.  In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent.  Therefore, a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a claim under Rule 12(b)(6).

*Id.* (citations omitted).  Specifically, the court pointed out that there was no specific factual support for the plaintiff's assertion of racial discrimination and

there were other reasons discernible from the record which suggested an alternative reason for the conviction and sentence disparity.  Likewise, in the present case, there are other discernible reasons for the Board's failure to pay Miller.  For instance, Miller does not state that she complied with the Connecticut Rules of Professional conduct requiring a lawyer to communicate to the client in writing the scope of the engagement and the fees and expenses for which the client will be responsible.  Rule 1.5(b) provides that "[t]he scope of the representation, the basis or rate of the fee and expenses for which the client will be responsible, shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate."  Miller has neither alleged that the Board was a regularly represented client, nor that she communicated her fees or scope of representation to either the Board or Anastasi.

The facts of *Dickerson v. State Farm Fire & Cas. Co*., 95 CIV. 10733 MBM, 1997 WL 40966 (S.D.N.Y. Feb. 3, 1997) aff'd, 133 F.3d 906 (2d Cir. 1997) provide further elucidation of the pleading standard.  The African American plaintiffs suffered a casualty loss of property stored in a rented storage facility and allegedly stolen during a burglary.  Plaintiffs then filed a claim with the defendant insurer.  To clarify the claim, the insurer requested purchase receipts and extensive documentation as to every stolen item, as well as sworn attestations and examinations under oath of the plaintiffs' family members to whom the property belonged.  The insurer denied the Plaintiffs' claim because of

concealment, fraud and false swearing.  *Id*. at *1.  In bringing a § 1981 claim, the plaintiffs argued that, despite industry custom, the insurer had failed to offer a reserve amount to settle the claim, delayed processing the claim so that it would not have to make payment under the policy, and that the fact that no insured had previously filed a complaint claiming improper denial based on defendant's allegations of fraud or misrepresentation show that defendant's charge against plaintiffs was pretextual and arbitrary, all of which demonstrated that the insurer had employed a "unique and unprecedented approach . . . apparently reserved and applied *only* to an African-American family."  *Dickerson*, 1997 WL 40966, at *2.

The court ruled that the Dickersons failed to plead sufficient facts to sustain a claim of race discrimination under § 1981.  Although the court acknowledged that the plaintiffs had asserted generally that the insurer had applied conditions to performing the insurance contract, including demands for documentation, testimony and financial documents, which were "different from and more burdensome than conditions defendant applies to similarly situated white claimants," the court concluded that such allegations were not enough to sustain a racial discrimination claim.  The court clarified that "[t]o present a claim that they were subject to demands and conditions different from those imposed on white policy holders, and thus to present facts giving rise to an inference of discrimination, plaintiffs must at least 'relate specific instances where persons situated similarly in all respects were treated differently.'"  *Id*. at *6 (citations omitted).  The court also concluded that the plaintiffs had failed to demonstrate

an intent to discriminate by alleging facts sufficient to "give rise to a plausible inference of racially discriminatory intent," as the plaintiffs had offered no facts to support a finding of racial animus. *Id.* at *3 (citing *Yusuf,* 35 F.3d at 713). The plaintiffs had similarly offered no evidence that any employee of the insurer involved in processing their claim made racial slurs or even more subtle racially suspect comments that would evidence an intent to discriminate based on race. Thus, "in the absence of any specific factual support for a claim of racial animus" and where plaintiffs' § 1981 claim was based only on "naked assertions" of racial discrimination, the court concluded that plaintiffs could not sustain a § 1981 claim for racial discrimination.

Here, as in Yusuf and Dickerson, Miller has failed to provide any specific factual support for her claim of racial animus, and thus her § 1981 claim must fail. *Compare Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 332 F. Supp. 2d 592 (S.D.N.Y. 2004) (dismissing § 1981 claim where plaintiff had failed to allege that sabotage allegedly undertaken by defendants was racially motivated); *Timmons v. City of Hartford*, 283 F. Supp. 2d 712, 717-18 (D. Conn. 2003) (dismissing § 1981 claim where contractor plaintiffs did not allege that city's actions against them relating to work performed under city's property rehabilitation program were taken because of racial discrimination and where plaintiffs did not allege that similarly situated non-minority contracts were treated differently); *and Garg v. Albany Indus. Dev. Agency*, 899 F. Supp. 961, 967 (N.D.N.Y. 1995) aff'd sub nom. *Garg v. City of Albany*, 104 F.3d 351 (2d Cir. 1996) (dismissing § 1981 claim where Asian Indian hotel owner plaintiffs conclusorily

13

alleged that mortgage company had racially discriminated against them when, among other things, it allegedly failed to dispense all mortgage funds and unreasonably delayed disbursement); *with Dunk v. Brower*, 07CIV7087(RPP), 2009 WL 650352 (S.D.N.Y. Mar. 12, 2009) (denying motion to dismiss § 1981 claim for discrimination in the making/enforcing of contracts, where plaintiff's complaint alleged that he had been asked to cease martial arts training at school because of other students' negative comments about his Native American race, his membership in a Native American community, and his membership in the Ramapough Nation, and which referred to the community's "racial characteristics and racially stereotypical behavior").

### i. Municipal Liability

Similarly, Plaintiff's claim for municipal liability must also fail.  "[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality - or an individual sued in his official capacity - the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) (internal citations omitted).

> To show a policy, custom, or practice, the plaintiff need not identify an express rule or regulation.  It is sufficient to show, for example, that a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials.  A policy, custom, or practice may also be inferred where the municipality so failed to train its employees as to

14

> display a deliberate indifference to the constitutional
> rights of those within its jurisdiction.

*Id*. (internal citations and quotation marks omitted).

Although the Plaintiff has brought this action against Anastasi in his official capacity and against the Board of Education, both proxies for the City of Bridgeport itself in terms of municipal liability, she has not alleged that any acts allegedly depriving her of her civil rights were performed pursuant to a municipal policy, custom, or practice, nor has she alleged that any deprivation was a result of the municipality's failure to train its employees.  Indeed, the only allegation in the complaint that could be remotely construed as relating to a municipal liability claim is that the Defendants "have paid Caucasian attorneys for the legal services performed by them, unlike [their] refusal to pay for such services performed by Plaintiff."  There is no allegation, though, that the City of Bridgeport or the Board acted pursuant to a policy, custom, or practice of racially discriminating against African Americans in the making or enforcement of contracts, or pursuant to a policy of not paying African American attorneys for their services.  Absent any such allegation, Plaintiff's municipal liability claim is dismissed.

### b. 42 U.S.C. § 1981: Discrimination in the Making or Enforcement of Contracts

Section 1981 prohibits intentional racial discrimination which affects "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  Thus, any claim brought under § 1981 for discrimination in the making or enforcement of contracts "must initially identify

an impaired contractual relationship . . . under which the plaintiff has rights."
*Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).  "Absent the
requirement that the plaintiff himself must have rights under the contractual
relationship, § 1981 would become a strange remedial provision designed to fight
racial animus in all of its noxious forms, but only if the animus and the hurt it
produced were somehow connected to somebody's contract.  [The Supreme
Court has] never read the statute in this unbounded—or rather, peculiarly
bounded—way."  *Id.*

The term "contract" pursuant to § 1981 adopts its ordinary common law
meaning.  *Lauture*, 216 F.3d at 261 ("In drafting § 1981, Congress did not seek to
promulgate some specialized federal definition of contract law, but merely
intended the term 'contract' to have its ordinary meaning.");  *see also United
States v. Shabani*, 513 U.S. 10, 13 (1994) (upholding "settled principle of statutory
construction that, absent contrary indications, Congress intends to adopt the
common law definition of statutory terms").  Under Connecticut law, "in order to
form a contract, generally there must be a bargain in which there is a
manifestation of mutual assent to the exchange between two or more parties"
whose identities are "reasonably certain."  *Ubysz v. DiPietro*, 185 Conn. 47, 51,
(Conn. 1981);  *see also Bender v. Bender*, 292 Conn. 696, 728 (Conn. 2009)
(substantially same).  In other words, there must be a meeting of the minds: "the
court must find that the parties' minds had truly met…if there has been a
misunderstanding between the parties, or a misapprehension by one or both so
that their minds have never met, no contract has been entered into by them and

the court will not make for them a contract which they did not themselves make." *Tsionis v. Martens*, 116 Conn. App. 568, 577 (Conn. App. 2009) (internal citations omitted).

A contract may be express or implied.  *Janusauskas v. Fichman*, 264 Conn. 796, 804 (Conn. 2003).  An implied contract can refer to either an implied in fact or to an implied in law contract.  An implied in law contract is "not a contract, but an obligation which the law creates out of the circumstances present, even though a party did not assume the obligation.... It is based on equitable principles to operate whenever justice requires compensation to be made."  *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 574, (Conn. 2006).  A contract implied in law is another name for a claim of unjust enrichment.  *Id*. at 573-74.

On the other hand, "[a]n implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties."  *Id*. at 573-74.  A contract implied in fact is "founded upon a meeting of minds, which, although not embodied in an express contract is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding."  *Hercules Inc. v. U.S.*, 516 U.S. 417, 424 (1996) (quoting *Baltimore & Ohio R.R. Co v. U.S.*, 261 U.S. 592, 597 (1923)).  An implied in fact contract arises "where a plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefor, and the defendant, knowing such circumstances, avails himself of the benefit of those services."  *Janusauskas*, 264 Conn. at 804-05.  Courts, though, have been reluctant to enforce implied contracts in the public

sector, as doing so "would invite endless litigation on the basis of misinformation by employees, thereby drawing down the public fisc." *Biello v. Town of Watertown*, 109 Conn. App. 572, 583 (Conn. App. Ct. 2008) (holding that representations by municipal employees not made in writing are of particularly little value in proving existence of implied contract).

Nowhere in her complaint does Plaintiff allege that she had an express contract with the Board or with Defendant Anastasi. Thus, the Court addresses Plaintiff's various implied contract arguments.

### i. Contract Pursuant to Conn. Gen. Stat. § 7-101a

The Plaintiff chiefly asserts that her § 1981 claim rests on an implied contract created between her and the Bridgeport Board of Education pursuant to Conn. Gen. Stat. § 7-101a, which provides for the indemnification of municipal employees in certain legal actions brought against them. The U.S. Supreme Court has held, though, that "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985); *see also N.Y. State Court Officers Ass'n v. Hite*, 851 F. Supp. 2d 575, 582 (S.D.N.Y. 2012) aff'd, 475 F. App'x 803 (2d Cir. 2012) (quoting same). The Court has further explained that

> [t]his well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. Policies, unlike

18

> contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body.  Indeed, the continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.  Thus, the party asserting the creation of a contract must overcome this well-founded presumption, and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.

*Nat'l R.R. Passenger Corp.*, 470 U.S. at 466 (internal quotation marks and citations omitted).  Recognizing the "fundamental legislative prerogative to reserve to itself the implicit power of statutory amendment and modification," the Connecticut Supreme Court has similarly held that "the well established rules of statutory construction" deem "that a statute does not create vested contractual rights absent a clear statement of legislative intent to contract."  *Pineman v. Oechslin*, 195 Conn. 405, 414 (Conn. 1985); *Cece v. Felix Indus., Inc.*, 248 Conn. 457, 465-66 (Conn. 1999) (same).  Thus, courts must presume that a statute does not create private vested contractual rights unless the legislature clearly and unambiguously intended otherwise.

To determine whether Conn. Gen. Stat. § 7-101a confers contractual rights on the Plaintiff the Court must first examine the language of the statute.  *Nat'l R.R. Passenger Corp.*, 470 U.S. at 466 ("In determining whether a particular statute gives rise to a contractual obligation, it is of first importance to examine the language of the statute.") (internal quotation marks and citation omitted);

*Pineman*, 195 Conn. at 410 ("In determining whether a law tenders a contract to a citizen it is of first importance to examine the language of the statute").  The plain meaning rule, codified at Conn. Gen. Stat. § 1-2z, dictates that

> [t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes.  If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.

Conn. Gen. Stat. § 1-2z; *see also Envirotest Sys. Corp. v. Comm'r of Motor Vehicles*, 978 A.2d 49, 53 (Conn. 2009).

Conn. Gen. Stat. § 7-101a states, in relevant part:

(a) Each municipality shall protect and save harmless any municipal officer...or any municipal employee of such municipality from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence, or for alleged infringement of any person's civil rights, on the part of such officer or such employee while acting in discharge of his duties.

Conn. Gen. Stat. § 7-101a(a).  Subsection (a), which provides that a municipality "shall protect and save harmless" any municipal *officer* or *employee*, does not direct that municipalities are to have a direct contractual relationship with counsel for such defendant municipal officers or employees, nor does it either mention any rights or obligations with respect to counsel or explicitly give counsel standing to bring suit under the statute.  Section 7-101a goes no further than to require municipalities to "protect and save harmless" its officers and employees from financial loss and expense arising from negligence or civil rights

actions against them, although it prescribes no specific manner in which the protection must be undertaken.  Thus, the statute on its face lacks a clear statement of any intent to provide contractual rights to attorneys representing municipal employees.

The legislative history of § 7-101a comports with the conclusion that the statute does not create contractual rights between the municipality and counsel for its defendant employees or officers.  At the time of its enactment, the Connecticut legislature explained that the purpose of § 7-101a was to "provide indemnification for commission and board members against claims based on their actions as such members."  H.R. 9256, 1971 Leg., January session (Conn. 1971).  Later enactments of and amendments to the statute consistently used the term "indemnification" in the legislative Statement of Purpose, including the most recent amendment, which extended indemnification coverage to part-time municipal employees.  H.B. 7263, 1989 Leg., January session (Conn. 1989).  Although indemnification is not defined in the legislative history, it is commonly defined as "the action of compensation for loss or damage sustained;" to indemnify is to "reimburse (another) for a loss suffered because of a third party's or one's own act or default," or to "give (another) security against such a loss."  *Black's Law Dictionary* 837 (9th ed. 2009).  The legislative history of § 7-101a speaks exclusively of the rights of municipal officers and employees to indemnification from the municipality in certain types of actions; the history is devoid of any reference to any obligations created between the municipality and any attorney representing a defendant officer or employee.  In the absence of any

language whatsoever evidencing an intent by the Connecticut legislature to create contractual rights between municipalities and attorneys representing defendant officers or employees, this Court may not infer the existence of such contractual rights.

Connecticut case law also supports the conclusion that § 7-101a confers no contractual rights on the Plaintiff.  Numerous Connecticut courts have held that § 7-101a is an indemnification statute that does not provide a direct cause of action for a third party to bring suit against a municipality.  *See, e.g., Orticelli v. Powers*, 197 Conn. 9, 14 (Conn. 1985) ("By its terms, General Statutes § 7–101a(a) is a provision in this indemnification statute which protects municipal officers and full-time municipal employees from financial loss and expenses arising out of damage suits, including civil rights suits."); *Vibert v. Bd. of Educ. of Reg'l Sch. Dist. No. 10*, 260 Conn. 167, 174 (Conn. 2002) (§ 7-101a is an indemnification statute); *Rodriguez v. Anker*, FST CV 076000465 S, 2009 WL 323603 (Conn. Super. Ct. Jan. 12, 2009) ("It is clear that § 7-101a does not provide for a direct cause of action against a municipality" by a third party); *Early v. Allen*, CV065003421, 2007 WL 611261, at *5 (Conn. Super. Ct. Feb. 7, 2007) ("The language of § 7-101a gives no indication that the legislature intended the statute to provide an injured person an independent cause of action against a municipality"); *Williams v. City of Bridgeport Bd. of Educ.*, CV054009664, 2007 WL 3173457 (Conn. Super. Ct. Oct. 12, 2007) (same); *Kuriansky v. City of Stamford*, CV91 0116189 S, 1992 WL 65428, at *3 (Conn. Super. Ct. Mar. 25, 1992) ("The . . . statute is an indemnification statute. . . The statute is therefore designed to provide indemnification to the

employee from the municipality and there is nothing contained in the statute authorizing a direct action [by a third party]"); *Atwood v. Town of Ellington*, 427 F. Supp. 2d 136, 142 (D. Conn. 2006) (JBA) ("This statute governs allocation of legal expenses between a municipality and its employees who are subject to civil suits, but does not provide a direct cause of action against a municipality."); *Gillespie v. Ancona*, 3:97-CV-2045 (EBB), 1999 WL 66538, at *5 (D. Conn. Feb. 4, 1999) ("section 7–101a does not provide plaintiffs with a direct right of action against a municipality"); *Wilson v. City of Hartford*, CIVA3:97CV00671(AWT), 1998 WL 229819 (D. Conn. Mar. 24, 1998) (§ 7-101a does not authorize a direct action against a municipality or against a municipal employee).

Rather,

> The statute merely places the burden on a municipality to protect (i.e., to pay the costs of litigation and provide counsel for) and save harmless (i.e., indemnify) its employees who are sued for negligent acts committed in the scope of their employment.  The statute . . . speaks only of the relationship between the municipal employee and his employer.

*Early v. Allen*, CV065003421, 2007 WL 611261, at *5 (Conn. Super. Ct. Feb. 7, 2007) (collecting cases holding that 7-101a provides no independent cause of action). Thus, "in passing this section, the legislature countenanced two potential causes of action: one in which an injured party files claim against a liable municipal employee; and a second, in which the liable municipal employee files claim, for indemnification, against his municipal employer." *Id.* at *6; *see also Parsons v. W. Hartford Bd. of Educ.*, CV94 0533484, 1994 WL 530169, at *2 (Conn. Super. Ct. Sept. 15, 1994) (§ 7-101a and § 10-235 are "meaningful for the class of people

sought to be protected-employees of boards of education and towns. These statutes were not passed to give direct causes of action to anyone else."); *Peters ex rel. Estate of Peters v. Town of Greenwich*, CV950147192S, 2001 WL 51671 (Conn. Super. Ct. Jan. 2, 2001) (same).

Though most of the existing interpretations of Conn. Gen. Stat. § 7-101a pertain to plaintiffs bringing suit directly under the statute rather than using the statute as a basis to show a contractual relationship as Plaintiff does, this case law demonstrates the limited scope and applicability of § 7-101a for plaintiffs who are not municipal employees. Indeed, in a nearly identical case filed by this very Plaintiff in Connecticut Superior Court alleging claims for quantum meruit and unjust enrichment against the Board for its failure to pay Ms. Miller pursuant to the same three invoices about which she complains in this action, the court held that Ms. Miller "would have no standing under [Conn. Gen. Stat. § 7-101a] to bring an action against the defendant to recover her legal fees." *Miller v. Bridgeport Bd. of Educ.*, No. CV106011406, 2011 WL 1886562, at *3 n.6 (Conn. Super. Ct. Apr. 21, 2011).[2] It is thus clear that the Plaintiff in this action would not have standing to bring suit under § 7-101a, as the statute confers no rights on her.

To bolster her contract claim Miller also argues that "[t]he statute does not prohibit the municipal employee from choosing his/her own attorney and indeed Mr. Cimmino had been permitted to do," and thus the Board's payment of Cimmino's prior attorney is an acknowledgement of an implied contract between

---

[2]    The complaint in the Plaintiff's Connecticut Superior Court action is nearly identical to her complaint in this action, except that it did not posit claims for discrimination in the making or enforcement of contracts pursuant to 42 U.S.C. § 1981, instead opting for claims under quantum meruit and unjust enrichment.

the Board and the attorney providing a legal defense for a municipal employee. [Dkt. 16, P's Opp. to MTD, p. 7].  While the statute does not explicitly prohibit an employee from choosing his or her own attorney, § 7-101a also does not explicitly allow for such choice.  At least one Connecticut court has held that a municipality "is not obligated to permit a municipal employee to select counsel of his own choosing."  *Cusick v. City of New Haven*, CV010453210S, 2002 WL 31235421, at *1 (Conn. Super. Ct. Aug. 30, 2002) (denying motion to disqualify counsel provided by city to municipal employee where employee could not establish existence of conflict of interest).  Although the Connecticut Supreme Court has not addressed this issue explicitly, it has concluded that § 7-101a(a) "at least permit[s], or authorize[s], the same attorney to represent a municipality and an employee." *Pitchell v. City of Hartford*, 247 Conn. 422, 431 (Conn. 1999).  The *Pitchell* Court further concluded that, in a negligence action against a police officer, the defendant city had the statutory authority to retain an attorney to file an appearance on behalf of the officer, notwithstanding a potential conflict of interest between the city and the officer.  *Id.* at 431-32 ("There is nothing extraordinary about an attorney entering an appearance on behalf of a client and later withdrawing due to a conflict of interest.  Accordingly, the existence of a potential conflict of interest between the city and [defendant officer] did not alter the city's authority to file an appearance on behalf  of [the officer] or alter [his] ability to raise his right to claim insufficient process.").  Moreover, this court has previously recognized the right of the municipality to provide representation for an employee defendant, concluding that "[a]lthough a municipality may meet this

obligation [to hold an employee harmless under § 7-101a] by hiring separate lawyers for itself and its employees, in many cases it may be much more economical to have the same attorney represent both clients," so long as the municipality takes steps to reduce or eliminate any potential conflict of interest between the municipality and the employee.  *Manganella v. Keyes*, 613 F. Supp. 795, 798 (D. Conn. 1985) (EBB).  Because a municipality may provide counsel for its defendant official or employee without the employee's express consent to that particular attorney, this Court logically infers that the municipal employee does not have a right to choose his own counsel pursuant to § 7-101a.

Finally, although courts have recognized that a municipality may choose to provide a defense for a defendant officer or employee, nothing in § 7-101a compels the Board to pay the Plaintiff for her representation of Cimmino.  Rather, the statute only requires that the municipality indemnify the employee – Cimmino – for his legal fees.  *See Miller v. Bridgeport Bd. of Educ.*, No. CV106011406, 2011 WL 1886562, at *3 (Conn. Super. Ct. Apr. 21, 2011) (reaching identical conclusion as to Plaintiff in this action); *Vibert*, 260 Conn. at 174-75, 176-77 (noting that § 7-101a is an indemnification statute, and holding that § 10-235, an indemnification provision nearly identical to § 7-101a applying to various Board of Education staff, could not be read to impose a duty to defend "because a duty to indemnify for attorney's fees cannot coexist with a duty to defend: it would be impossible for a board [of education] to indemnify a teacher for attorney's fees if the board of education already has provided the teacher with counsel.").  Thus, even and especially if § 7-101a merely provides for indemnification rather than a defense of

a municipal employee, the Plaintiff's contract theory must fail.  Cimmino, as the municipal employee, must first sustain a loss (the payment of legal fees owed to Plaintiff), before Cimmino himself could be eligible for indemnification under § 7-101a, and after which Cimmino, and not the Plaintiff, would have standing to sue pursuant to the statute.  In other words, the Board does not indemnify or owe reimbursement to Plaintiff directly, but rather, it owes only a duty of indemnification to Cimmino.

This Court agrees that the duty enumerated in § 7-101a does not equate to a duty to allow individual defendants to their choice of legal counsel, nor does the existing case law support Plaintiff's assertion that Cimmino had a right to choose his legal representative without the assent of the municipality.  Here, the Plaintiff alleges only that Cimmino chose her to represent him in place of his former attorney, that she "inquired of Defendant Anastasi if there was any requirement she needed to fulfill in order to assume the defense of Cimmino," and that "[a]t no time did Anastasi inform Plaintiff of any reason why she was prohibited from assuming the defense of Cimmino, nor any other impediment to her providing legal services."  However, the Plaintiff has nowhere alleged that the municipality agreed to pay her for legal services stemming from Cimmino's representation, that she asked Anastasi whether there was any impediment to receiving payment from the municipality for legal services provided in Cimmino's defense, whether Anastasi enumerated any requirements Miller could fulfill to receive payment for her services, or whether, if he did, the Plaintiff fulfilled those requirements.  While the Plaintiff has alleged that Anastasi did not inform her of

any reason why she was prohibited from assuming Cimmino's defense, she has not alleged that the municipality agreed to Cimmino's choice of Miller as his counsel, and therefore there is no reason for the Court to believe that Anastasi would have had a duty to inform the Plaintiff of any such impediments.  Moreover, Cimmino's independent selection and substitution of counsel without consulting the Board indicates that he is the intermediary in any relationship between the municipality and his defense counsel.

Therefore, because § 7-101a is principally an indemnification statute assigning rights only to the municipal employee to be indemnified, and in the absence of any allegation that the municipality assented to payment for Plaintiff's legal services, Mr. Cimmino could bring an action under § 7-101a against the municipality for indemnification of any amounts he paid to the attorney retained by him.  In other words, absent evidence that the municipality approved Cimmino's choice of Miller's representation of him, the Board does not owe reimbursement to Plaintiff directly, but rather, may owe to Cimmino the value of payments he has made to Miller for her legal counsel.

In sum, Conn. Gen. Stat. § 7-101a does not confer contractual rights on the Plaintiff – who is not a municipal employee[3] – such that she could satisfy the third

---

[3]    The Plaintiff does not allege that she is a municipal employee, nor can she be considered one for the purposes of this statute.  The term "employee" is not defined in Title 7 of the Connecticut General Statutes.  Pursuant to common definitional usage, an "employee" is a person who works in the service of an employer "under an express or implied contract of hire, under which the employer has the right to control the details of work performance." *Black's Law Dictionary* 602 (9th ed. 2009).  Cimmino chose Plaintiff to be his counsel in place of his original attorney; Plaintiff has no relationship to the Bridgeport Board of Education outside of her representation of one of its employees, and it is Cimmino who has the right to control the details of Plaintiff's work performance.

element of her 42 U.S.C. § 1981 claim for discrimination in the making or enforcement of contracts.

> ii. <u>Implied in Fact Contractual Relationship between Plaintiff and the Board</u>

Defendants urge that Plaintiff's complaint should be dismissed because the Plaintiff has not alleged the existence of any communications or documents giving rise to an implied contract.  The Plaintiff contends that an implied contract exists between her and the Board of Education not only pursuant to § 7-101a, but also because of the "performance by Plaintiff of legal services with the full knowledge and acquiescence of City Attorney Anastasi" and because "[t]he failure of Anastasi, after notice by Plaintiff, to take any action to object to Plaintiff's performance of legal services also creates an implied contractual obligation for payment of services on a detrimental reliance theory."  [Dkt. 16, P's Opp. to MTD, p. 7].  Plaintiff further argues that she "does not have to plead specifically the existence of a contractual relationship between her and either of the Defendants."  [Dkt. 16, P's Opp. to MTD, p. 7].

"The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were."  *Auto Glass Exp., Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 225 (Conn. 2009).  Plaintiff's implied in fact contract claim fails for the same reasons enumerated prior.  First, § 7-101a does not impose a duty to allow individual defendants to choose their own counsel and, as such, Plaintiff has failed to allege that the municipality assented to her representation of Cimmino in place of an

---

Thus, Plaintiff's relationship with the municipality is not sufficiently direct to make her a municipal employee.

attorney they had agreed to compensate for his legal services.  The Plaintiff has also not alleged that she asked Anastasi whether there was any impediment to receiving payment from the municipality for legal services provided in Cimmino's defense, whether Anastasi enumerated any requirements Miller could fulfill to receive payment for her services, or whether, if he did, the Plaintiff fulfilled those requirements.  In addition, the Plaintiff does not contend in her complaint that Anastasi even had the power to bind the municipality in contract such that the City would be liable to the Plaintiff for any breach, or that he would have had the power to prohibit Cimmino from hiring the Plaintiff with Cimmino's own funds.  Likewise, Plaintiff does not allege that any written communication exists between her and the municipality or that Anastasi spoke any words assenting to any sort of contractual relationship or acceptance of Plaintiff's services by Anastasi as an agent of the Board.

The crux of Plaintiff's complaint is that Defendants compensated Cimmino's prior attorney and did not respond negatively to Plaintiff's inquiry about assuming Cimmino's representation.  Plaintiff construes this silence as acceptance and formation of an implied contract.  Silence may constitute assent to an offer of contract if an offeree, by his words or conduct, leads the offeror to reasonably interpret that silence as such.  *John J. Brennan Const. Corp. v. City of Shelton*, 187 Conn. 695, 710 (Conn. 1982).  "Whether such conduct took place so as to create a contract is a question of fact."  *Sandella v. Dick Corp.*, 53 Conn. App. 213, 220 (Conn. App. Ct. 1999) (quoting *John J. Brennan Construction Corp., Inc.*, 187 Conn. at 710).  Here, though, the question of Anastasi's silence may not

reach the finder of fact as the Plaintiff has not alleged in either her complaint or in her opposition to the Defendants' motion to dismiss that she reasonably interpreted Anastasi's silence as assent to the alleged implied contract.  Nor has Plaintiff alleged in her complaint that the Defendants acted with the knowledge that the Plaintiff expected that she would be paid directly by the Bridgeport Board of Education rather than by her client, Andrew Cimmino, for legal services rendered.  Without the municipality's knowledge of the potential ramifications of their silence, there can be no tacit understanding by the Defendants and the complaint has failed to allege a necessary element for the formation of an implied contract.  *See Janusauskas*, 264 Conn. at 804-05 (an implied in fact may be found "where a plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefor, and the defendant, knowing such circumstances, avails himself of the benefit of those services.").

### iii.  Implied in Law Contract

To the extent that the Plaintiff has alleged the existence of a contract implied in law, the Court notes that an implied in law contract is "not a contract, but an obligation which the law creates out of the circumstances present, even though a party did not assume the obligation."  *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 574, (Conn. 2006).  An implied in law contract is another name for a claim of unjust enrichment, which is "grounded in the theory of restitution, not in contract theory."  *Schirmer v. Souza*, 126 Conn. App. 759, 764-67 (Conn. App. Ct. 2011).  Therefore, an implied in law contract does not support a § 1981 claim for discrimination in the making or enforcement of contracts.

### V.  Conclusion

For the foregoing reasons, Plaintiff's 42 U.S.C. § 1981 claim must fail and the Defendants' Motion to Dismiss [Dkt. 15] is GRANTED without prejudice to the Plaintiff filing an amended complaint within twenty-one (21) days of the date of this decision addressing the deficiencies in her 42 U.S.C. § 1981 claim.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: July 30, 2013